# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

RISE ABOVE FITNESS, INC.,
SALVATORE MACALUSO, and
JENNIFER MACALUSO,

        Plaintiffs,

v.

FRANCHOICE, INC. and
CAREYANN GOLLIVER,

        Defendants.

Case No. 19-cv-1435 (MJD/ECW)

**REPORT AND RECOMMENDATION**

This matter is before the Court on Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6).  (Dkt. 9.)  This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons discussed below, the Court recommends that Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) be granted in part and denied in part.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs initiated this action on May 30, 2019.  (Dkt. 1.)  Plaintiffs subsequently filed an Amended Complaint on June 14, 2019.  (Dkt. 6.)

The operative Amended Complaint alleges as follows: Plaintiffs Salvatore and Jennifer Macaluso are individual citizens of North Carolina and reside in North Carolina. (Dkt. 6 ¶ 4.)  Plaintiff Rise Above Fitness, Inc. is a North Carolina corporation with its principal place of business in North Carolina.  (*Id.* ¶ 5.)

Mr. Macaluso became interested in purchasing a franchise in August 2016. (*Id.* ¶ 10.) In his search for a franchising opportunity, Mr. Macaluso came across an advertisement for Defendant FranChoice Inc. ("FCI"). (*Id.*) FCI is a corporation formed under the laws of Minnesota, with its principal place of business in Eden Prairie, Minnesota. (*Id.* ¶ 6.) It is a franchise broker that assists prospective franchisees in identifying, investigating, selecting and acquiring franchises. (*Id.*)

Prompted by the advertisement, Macaluso explored FCI's website (https://www.franchoice.com/), on which FCI held itself out as directing prospective franchisees to "high quality franchise businesses that match your requirements" and represented that it would match "entrepreneurs like you with the perfect franchise business." (*Id.* ¶ 11.) FCI stressed that Plaintiffs could "avoid the confusion of researching" franchise opportunities and could focus on those franchises that FCI had "selected …as franchise businesses matching [his] requirements." (*Id.*) FCI further represented that "[t]hey will be by your side coaching you and making sure you are getting the information you need in order to make the best decision for you." (*Id.*)

After reviewing FCI's website, Macaluso provided FCI with his contact information and Careyann Golliver ("Golliver") contacted him thereafter. (*Id.* ¶ 12.) Golliver, an FCI representative, is an individual residing in Parker, Colorado and is a citizen of that state. (*Id.* ¶ 7.) On August 11, 2016, Golliver sent Macaluso literature that stated, among other things, that purchasing a franchise business provided franchisees with the opportunity to obtain an "executive lifestyle" where it was possible to "earn in excess of $100,000 a year," "retire by age 55," and "purchase a second vacation home."

(*Id.* ¶ 13.)

In an August 24, 2016 phone call, Golliver introduced Macaluso to the three franchise opportunities she had matched him with, including one with non-party ILKB, LLC.  (*Id.* ¶ 14.)  Non-party ILKB, LLC ("ILKB") is the franchisor of "iLoveKickboxing.com" franchises, which are fitness facilities dedicated to kickboxing, a form of physical fitness.  (*Id.* ¶ 8.)  At all relevant times, ILKB was a New York limited liability company with its headquarters in New York State.  (*Id.*)  ILKB offered and sold franchises only in and from New York State.  (*Id.*)

Golliver made a number of representations to Macaluso on August 24, 2016 about the ILKB franchise opportunity, including that: no ILKB locations had closed and that eight new locations were opening a month; ILKB franchises were suitable for absentee ownership; ILKB headquarters would conduct all the marketing and be able to generate any amount of leads needed to make the business successful; opening an ILKB franchise only took a $250,000 initial investment and that the franchise opportunity was appropriate for franchisees who did not have a large amount of cash on hand; franchisees could expect to break even within 60 days of opening an ILKB studio; and a studio required 200 members to break even.  (*Id.* ¶ 15.)  Golliver also provided Macaluso's contact information to an ILKB representative, who contacted him the same day.  (*Id.* ¶ 14.)

In an August 24, 2016 email following her phone call, Golliver  represented to Macaluso, in order to induce him to purchase a ILKB franchise, that ILKB "back[s] up their system with superior training, marketing and operational support, was one of the

fastest growing franchises in the United States, was a great match for him, and was experiencing a high demand for franchises.  (*Id.* ¶ 16.)  Golliver also pressured Macaluso to make a quick decision.  (*Id.* ¶ 17.)

In reliance on the representations of FCI and Golliver, Plaintiffs signed a multi-unit franchise agreement on November 4, 2016, paid ILKB $145,000 in franchise fees for the purchase of five territories; signed five franchise agreements on November 4, 2016; and spent over $500,000 building out and outfitting a location in Matthews, North Carolina and a second location in Fort Mill, South Carolina.  (*Id.* ¶ 18.)  FCI and Golliver received a commission from ILKB in excess of $90,000 of the $145,000 that Macaluso paid to ILKB.  (*Id.* ¶ 20.)

After opening the business, Macaluso learned that the representations that FCI and Golliver had made to him relating to ILKB franchises were untrue, including the representations that: ILKB had not experienced zero location closures; it was suitable for absentee ownership; the support provided by ILKB, representations regarding ILKB's marketing and its effect on Plaintiffs' business; the costs to build a studio; and representations relating to the money expected to be made by franchises.  (*Id.* ¶ 21.)

Defendants also failed to do or disclose their due diligence by not discovering or communicating to Plaintiffs the existence of lawsuits and a bankruptcy related to ILKB's founder and its affiliates.  (*Id.* ¶¶ 22-23.)  Plaintiffs assert that had they known of this information they would not have purchased any franchises from ILKB.  (*Id.* ¶ 23.)

Plaintiffs assert claims for relief against Defendants for their alleged violations of the New York Franchise Sales Act, N.Y. Gen. Bus. L. 680 *et seq.*; the North Carolina

Unfair and Deceptive Trade Practices Act; the South Carolina Unfair Trade Practices Act; and the Minnesota Franchise Act, Minn. Stat. §80C.01 *et seq.* Plaintiffs also assert claims against Defendants for common law fraud and negligent misrepresentation.

Defendants move to dismiss Plaintiffs' New York Franchise Sales Act ("NYFSA"), South Carolina Unfair Trade Practices Act ("SCUTPA"); and Minnesota Franchise Act ("MFA") claims.

## II.    <u>LEGAL STANDARD</u>

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the pleadings are construed in the light most favorable to the non-moving party, and the facts alleged in the complaint must be taken as true. *See Ashley County, Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). In addition, a court must afford the plaintiff all reasonable inferences from those allegations. *See Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010). At the same time, to withstand a motion to dismiss under Rule 12(b)(6), litigants must properly plead their claims under Federal Rule of Civil Procedure 8 and meet the principles articulated by the United States Supreme Court in *Iqbal* and *Twombly*.

Under Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The pleading standard articulated by Rule 8 "does not require detailed factual allegations, but it [does demand] more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of

the elements of a cause of action will not do.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Thus, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "[T]he plausibility standard, which requires a federal court complaint to state a claim for relief that is plausible on its face, . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 717 (8th Cir. 2011) (internal quotation and citation omitted). "Determining whether a complaint states a plausible claim for relief will, . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679 (citation omitted).

> Following *Twombly* and consistent with *Iqbal*, the Eighth Circuit explained:
>
> While a plaintiff need not set forth "detailed factual allegations," *Twombly*, 127 S. Ct. at 1964, or "specific facts" that describe the evidence to be presented, *Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (per curiam), the complaint must include sufficient factual allegations to provide the grounds on which the claim rests.  *Twombly*, 127 S. Ct. at 1965 n. 3.  A district court, therefore, is not required "to divine the litigant's intent and create claims that are not clearly raised," *Bediako*, 354 F.3d at 840, and it need not "conjure up unpled allegations" to save a complaint.  *Rios v. City of Del Rio*, 444 F.3d 417, 421 (5th Cir. 2006) (internal quotation omitted).

*Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009).

If matters outside the pleadings "are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P.

12(d).  While matters "outside the pleadings" may not be considered in deciding a Rule

12 motion to dismiss, documents "necessarily embraced by the complaint are not matters

outside the pleading."  *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).

Thus, while courts primarily consider the allegations in the complaint in determining

whether to grant a Rule 12(b)(6) motion, courts additionally consider matters

incorporated by reference or integral to the claim, items subject to judicial notice, matters

of public record, orders, items appearing in the record of the case, and exhibits attached

to the complaint whose authenticity is unquestioned, without converting the motion into

one for summary judgment.  *Id.*; *see also Miller v. Redwood Toxicology Lab, Inc.*, 688

F.3d 928, 931 n.3 (8th Cir. 2012).

## III.    ANALYSIS

### A.    Plaintiffs' Claim Under the New York Franchise Sales Act

According to Plaintiffs, FCI and Golliver violated the NYFSA by making false

representations and omissions to the Macalusos for the purpose of inducing them to

purchase an ILKB franchise.  (Dkt. 6 ¶ 30.)  Defendants argue that the NYFSA claim

fails as a matter of law because they are not franchisors, and because they did not offer or

sell any franchise to Plaintiffs, given that it was non-party ILKB who offered and sold the

franchises at issue and the Amended Complaint does not allege that Defendants offered

or sold a franchise to Plaintiffs on behalf of ILKB.  (Dkt. 11 at 9-12.)

Under New York law, "[t]he primary consideration of the courts in the

construction of statutes is to ascertain and give effect to the intention of the Legislature."

N.Y. Stat. Law § 92.  When the language of a statute is plain, courts are required to

follow its mandates. *See Kimmel v. State*, 29 N.Y.3d 386, 392, 80 N.E.3d 370, 373 (2017) (concluding that courts under New York law should look "first to the plain language of the statute[ ] as the best evidence of legislative intent") (quotation marks and citation omitted); *Better World Real Estate Grp. v. New York City Dep't of Fin.*, 122 A.D.3d 27, 35, 992 N.Y.S.2d 247 (2014) (citations omitted) ("[C]ourts should construe clear and unambiguous statutory language as to give effect to the plain meaning of the words used."). The NYFSA was enacted specifically to prevent, combat, and protect the franchisee from rampant franchise sales fraud, it is remedial in nature, and therefore, is to be liberally construed. *See A.J. Temple Marble & Tile, Inc. v. Union Carbide Marble Care, Inc.*, 162 Misc. 2d 941, 951, 618 N.Y.S.2d 155, 161 (Sup. Ct. 1994), *aff'd*, 214 A.D.2d 473, 625 N.Y.S.2d 904 (1995), *aff'd as modified*, 87 N.Y.2d 574, 663 N.E.2d 890 (1996) (citations omitted). In that "interpretative context, courts are obliged to 'harmonize the various provisions' of a statute to achieve its legislative purpose." *Id.* (citations omitted).

The NYFSA provides that the following conduct is unlawful:

2. It is unlawful **for a person, in connection with the offer, sale or purchase of any franchise**, to directly or indirectly:

(a) Employ any device, scheme, or artifice to defraud.

(b) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. It is an affirmative defense to one accused of omitting to state such a material fact that said omission was not an intentional act.

(c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

N.Y. Gen. Bus. Law § 687(2) (emphases added). "A **person who offers or sells** a franchise in violation of . . . [§ 687] is liable to the person purchasing the franchise for damages and, if such violation as willful and material, for rescission, with interest at six percent per year from the date of purchase, and reasonable attorney fees and court costs." N.Y. Gen. Bus. Law § 691(1) (emphasis added).

      **1.**      **Whether Defendants Are "Persons" Under the NYFSA**

While Defendants' arguments turn on the contention that it was ILKB as the franchisor who offered and sold the franchises at issue, that argument ignores the plain meaning of the NYFSA of who can be held liable under the Act. Even assuming that ILKB is the franchisor, liability under the NYFSA is not limited to franchisors; rather it extends broadly to "person[s]," which is defined under the NYFSA as follows:

> "Person" means an individual, corporation, partnership, joint venture, association, company, trust, unincorporated organization or other entity and shall include any other person that has a substantial interest in or effectively controls such person, as well as the individual officers, directors, general partners, trustees or other individuals in control of the activities of each such person.

N.Y. Gen. Bus. Law § 681(13). Indeed, Defendants, notwithstanding their assertion that they did not offer to sell or in fact sell a franchise as required for liability under the NYFSA, do not contest that they are persons for the purposes of § 681(13).

      **2.**      **Whether Defendants' Alleged Conduct Amounts to an "Offer" or an "Offer to Sell" Under the NYFSA.**

Plaintiffs argue that Defendants' conduct amounts to a solicitation to them to buy an ILKB franchise. (Dkt. 15 at 11-12.) Defendants' assertion that no liability can attach to them under the NYFSA, because there are no allegations in the Amended Complaint

that they sold or offered to sell an ILKB franchise to Plaintiffs, relies on an overly narrow construction of the term "offer" under the NYFSA. The NYFSA defines "offer" as follows:

> "Offer" or "offer to sell" includes **any attempt to offer to dispose of, or solicitation of an offer to buy, a franchise or interest in a franchise for value**. The terms "offer" and "offer to sell" do not include the renewal or extension of an existing franchise where there is no interruption in the operation of the franchised business by the franchisee.

N.Y. Gen. Bus. Law § 681(11) (emphases added).

The word "solicitation" is not defined within the NYFSA. Under New York law, courts "are to construe words of ordinary import with their usual and commonly understood meaning, and in that connection have regarded dictionary definitions as 'useful guideposts' in determining the meaning of a word or phrase." *Rosner v. Metro. Prop. & Liab. Ins. Co.*, 96 N.Y.2d 475, 479-80, 729 N.Y.S.2d 658, 660 (2001) (citation omitted). The plain meaning of the word "solicitation" is found in the dictionary; it in relevant part, means the "act or an instance of requesting or seeking to obtain something" or "[a]n attempt or effort to gain business." *Solicitation, Black's Law Dictionary* (11th ed. 2019); *see generally, Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 223 (1992) ("'Solicitation,' commonly understood, means 'asking' for, or 'enticing' to, something[.]") (citing *Black's Law Dictionary* (6th ed. 1990)).

Here, the Amended Complaint alleges that FCI held itself out as directing prospective franchisees to high quality franchise businesses (Dkt. 6 ¶ 11), and that Golliver served as the means to connect ILKB to Plaintiffs (*id.* ¶ 14). Moreover, Golliver allegedly made numerous of representations regarding favorable reasons why Plaintiffs

should purchase an ILKB franchise (*id.* ¶¶ 15-16), pressured Macaluso to purchase a

franchise quickly and possibly without fully investigating the opportunity (*id.* ¶ 17); and

Defendants were paid a commission from ILKB in excess of $90,000 of the $145,000

that Macaluso paid to ILKB for the sale of the franchises to Plaintiffs (*id.* ¶ 20).  Given

the NYFSA's broad language under § 687(2) prohibiting fraud "**in connection with** the

offer, sale or purchase of any franchise" and the statute's broad remedial purpose, the

Court finds that Plaintiffs have plausibly alleged that FCI solicited from Plaintiffs an

offer to buy an ILKB franchise, as evidenced by Defendants' alleged representations set

forth above, were made to entice an offer from Plaintiffs for an ILKB franchise.  While

Defendants argue that none of these solicitations amounted to an offer and that there are

no allegations of Defendants making a plausible solicitation (Dkt. 11 at 11-14; Dkt. 17 at

4-5), this argument ignores the fact that the definition of an "offer" includes solicitation

by Defendants of an offer from Plaintiffs to purchase a franchise, which is adequately

alleged in the Amended Complaint, as evidenced by the alleged numerous positive

statements made by Golliver as a whole regarding ILKB so that Defendants could

ultimately receive a commission from ILKB for the sale.  *See Reed v. Oakley*, 172 Misc.

2d 655, 658, 661 N.Y.S.2d 757, 759 (Sup. Ct. 1996), *aff'd*, 240 A.D.2d 991, 659

N.Y.S.2d 820 (1997) ("The conduct covered by the definition is not limited to the act of

signing on the dotted line after the solicitation is made.  Here, the solicitation and other

negotiations were made prior to approval, and, by definition, amounted to an offer to sell

prior to approval.").  Simply put, Plaintiffs have adequately alleged for purposes of the

NYFSA that Defendants' communications, taken together, were seeking to obtain and entice from Plaintiffs an offer to purchase an ILKB franchise.

Again, Defendants' arguments focus on the fact that the Amended Complaint does not allege that they are in the business of selling franchises or that they sold a franchise in this case. (Dkt. 11 at 11-12.) However, the NYFSA separately defines "franchisor" as "a person who grants a franchise." N.Y. Gen. Bus. Law § 681(5). Had the New York Legislature only meant for liability to attach to franchisors, they simply could have defined a "Person" as a Franchisor consistent with § 681(5). Instead, as set forth above, they defined it expansively. Moreover, while the Court agrees that there is no dispute that the ultimate transaction involving the sale of the franchise was between ILKB and Plaintiffs, the word "solicit" does not confine itself to a franchisor and the ultimate act of the offer and acceptance, especially here where it is alleged that Defendants had a financial incentive to convince Plaintiffs to purchase an ILKB franchise. *See generally*, *Reed*, 172 Misc. 2d at 658 ("The conduct covered by the definition is not limited to the act of signing on the dotted line after the solicitation is made."); *Pinter v. Dahl*, 486 U.S. 622, 643 (1988)[1] (finding with respect to the Securities Act that "[u]nder these

---

[1]      The Supreme Court went on to explain that:

> [B]rokers and other solicitors are well positioned to control the flow of information to a potential purchaser, and, in fact, such persons are the participants in the selling transaction who most often disseminate material information to investors. Thus, solicitation is the stage at which an investor is most likely to be injured, that is, by being persuaded to purchase securities without full and fair information.

*Id.* at 646-47. This is similar to the scenario alleged here, where "brokers" (Dkt. 6 ¶¶ 6, 43) such as FCI are poised to control the information disseminated to prospective

definitions, the range of persons potentially liable under § 12(1) is not limited to persons who pass title. The inclusion of the phrase 'solicitation of an offer to buy' within the definition of 'offer' brings an individual who engages in solicitation, an activity not inherently confined to the actual owner, within the scope of § 12.").

Defendants further argue that the remedies section of the NYFSA makes it clear that the NYFSA applies to franchisors, not Defendants. (Dkt. 11 at 16.) The remedies provision of the NYFSA provides:

> A person who offers or sells a franchise in violation of section six hundred eighty-three, six hundred eighty-four or six hundred eighty-seven of this article **is liable to the person purchasing the franchise <u>for damages and, if such violation as willful and material, for <span style="text-decoration: underline">rescission</span></u>**, with interest at six percent per year from the date of purchase, and reasonable attorney fees and court costs.

N.Y. Gen. Bus. Law § 691(1) (emphases added). Defendants argue that the language of Section 691 undercuts Plaintiffs' arguments that they can be held liable under the NYFSA because the remedy of rescission within this provision can only be granted through ILKB, the franchisor. (Dkt. 11 at 16-17.)

The fact that the remedies under the NYFSA include rescission along with damages as possible remedies does not mean that the NYFSA can only apply to franchisors or that a person cannot seek one remedy without seeking the other. Such an interpretation is contrary to the clear language of the statute. By way of example, there is no dispute that an employee of a "person" as defined under the NYFSA can be held liable

---

franchisees and it is at this solicitation stage where prospective franchisees are likely to be persuaded to purchase an ILKB franchise, especially where FCI and its agents are allegedly acting as an independent source of information and are ultimately receiving a benefit from a sale in the form of a substantial commission from ILKB (*id.* ¶ 20).

under the NYFSA.  *See* N.Y. Gen. Bus. Law § 691(3) (employees can be held liable to the same extent as an employer).  However, under Defendants' argument, such an employee could not be held liable because obviously the employee, even if they are an employee of a franchisor, does not have the ability to effect a rescission.  Simply put, Defendants' interpretation would rewrite the definition of "person" under the act to only mean a franchisor.  Given the expansive scope as to what includes a "person" and "offer" under the plain language of the NYFSA, the fact that the statute was "enacted specifically to prevent, combat and protect the franchisee from rampant franchise sales fraud," *A.J. Temple Marble & Tile*, 162 Misc. 2d at 951, and the need to harmonize the various provisions of the NYFSA to effectuate this purpose, *id.*, the Court finds that the intent of the New York Legislature was not only to punish franchisors but to ensure that brokers, such as FCI and their agents, are held accountable for the resulting harm to franchisees from their alleged fraudulent statements that franchisees acted in reliance on when deciding to purchase a franchise, even if the ultimate purchase is from a different party.

### 3.  Whether the Sale or Offer to Sell Occurred in New York.

Defendants also argue that dismissal of the NYFSA claim here is necessary under General Business Law § 683 because there are no allegations that Defendants or Plaintiffs have connections with New York or that any of the interactions between Plaintiffs and Defendants occurred in New York.  (Dkt. 11 at 14-15.)  Plaintiffs counter that the NYFSA applies in this case because FCI and Golliver solicited Plaintiffs to purchase an ILoveKickBoxing franchise from ILKB, and ILKB accepted Plaintiffs' offer to buy in New York.  (Dkt. 15 at 12-13.)

"The New York Franchise Sales Act [ ], GBL §§ 680-695, governs franchise transactions, but only when the sale or offer to sell occurs in New York." *EV Scarsdale Corp. v. Engel & Voelkers N. E. LLC*, 48 Misc. 3d 1019, 1028 (N.Y. Sup. Ct. 2015) (citing *A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 70 F. Supp. 3d 376, 393 (D.D.C. 2014), citing *JM Vidal, Inc. v. Texdis USA, Inc.*, 764 F. Supp. 2d 599, 616-17 (S.D.N.Y. 2011) ("[T]he NYFSA is applicable only to specific transactions solicited or accepted in New York, or affecting New York."), quoting *Century Pac., Inc. v. Hilton Hotels Corp.*, 2004 WL 868211, at *5 (S.D.N.Y. 2004)); *see generally,* N.Y. Gen. Bus. Law § 681(12)[2] (defining for the purposes of necessary disclosures under § 683 when an offer is made in New York).

---

[2]     Section 681(12) provides:

(a) An offer or sale of a franchise is made in this state when an offer to sell is made in this state, or an offer to buy is accepted in this state, or, if the franchisee is domiciled in this state, the franchised business is or will be operated in this state.

(b) An offer to sell is made in this state when the offer either originated from this state or is directed by the offeror to this state and received at the place to which it is directed.  An offer to sell is accepted in this state when acceptance is communicated to the offeror from this state.

(c) An offer to sell is not made in this state merely because a publisher circulates or there is circulated on his behalf in this state a bona fide newspaper or other publication of general, regular and paid circulation which has had more than two-thirds of its circulation outside this state during the past twelve months, or a radio or television program originating outside this state is received in this state.

N.Y. Gen. Bus. Law § 681(12).

In this case, the Amended Complaint alleges that ILKB offered and sold franchises only in and from New York State, and it is also alleged that ILKB accepted Macaluso's offer to buy a franchise in New York by countersigning the franchise agreement that Macaluso had executed, in New York.  (Dkt. 6 ¶¶ 8, 29.)  Given that the communications at issue allegedly induced Plaintiffs to ultimately make an offer to purchase a franchise in New York, which was accepted in New York, Plaintiffs' claim is governed by the NYFSA.

4.    **Conclusion**

For all of the reasons set forth above, Plaintiffs have adequately alleged a plausible claim against Defendants under the NYFSA and the Motion to Dismiss this claim should be denied.

**B.    Plaintiffs' Claim under the Minnesota Franchise Act**

According to Defendants, to be covered by the MFA, the sale or offer to sell had to be made in Minnesota.  (Dkt. 11 at 19-20.)  Defendants, relying upon Minn. Stat. § 80C.19, argue that the MFA cannot apply to Plaintiffs' claims because Plaintiffs have only identified  franchise units located outside Minnesota, and Golliver is alleged to reside in Colorado and only communicated to Plaintiffs (non-Minnesota residents) via the mail, email and the telephone.  (*Id.* at 19-21 (citing Dkt. 1 ¶¶ 7, 15-18).)  Plaintiffs counter with agency and respondeat superior theories, asserting that because Golliver, a

Colorado resident,[3] is the agent of a Minnesota corporation, the offer originated from

Minnesota for the purposes of the MFA.[4]  (Dkt. 15 at 20-23.)

Under Minnesota law:

No person may offer[5] or sell a franchise **in this state** by means of any written
or oral communication which includes an untrue statement of a material fact
or which omits to state a material fact necessary in order to make the
statements made, in the light of the circumstances under which they were
made, not misleading.

Minn. Stat. § 80C.13, subd. 2 (emphasis added).

With respect to liability under § 80C.13, the MFA defines an offer to sell or a

purchase of a franchise "in this state" as follows:

Subd. 1.  Applicable sales and offers to sell or purchase.  The provisions of
sections 80C.01 to 80C.22 concerning sales and offers to sell shall apply
when a sale or offer to sell is made in this state; when an offer to purchase is
made and accepted in this state; or when the franchise is to be located in this
state.

Subd. 2.  Offer to sell or purchase made in state.  For the purpose of sections
80C.01 to 80C.22, an offer to sell or to purchase is made in this state, whether
or not either party is then present in this state, when the offer originates from
this state or is directed by the offeror to this state and received by the offeree
in this state.

---

[3]    Plaintiffs do not plausibly allege that Golliver herself, outside of agency theory,
took any actions aimed towards or from Minnesota relating to the present claims.

[4]    Plaintiffs also point to the allegations in the Amended Complaint (Dkt. 6 ¶¶ 55, 58
where they assert that FCI and Golliver solicited Plaintiffs within Minnesota.  (Dkt. 15 at
19-20.)  However, these conclusory assertions are insufficient, as merely being a
formulaic recitation of a requirement for a viable MFA cause of action.  *See Iqbal*, 556
U.S. at 678.  It is clear by the specific facts alleged in the Amended Complaint that it was
Golliver as an agent of FCI who made the representations at issue to induce an offer from
Plaintiffs to ILKB.

[5]    Similar to the NYFSA, under the MFA, "offer" and "offer to sell" "includes every
attempt to offer to dispose of, and **every solicitation of an offer to buy**, a franchise or
interest in a franchise for value."  Minn. Stat. § 80C.01, subd. 16 (emphasis added).

> Subd. 3.  Offer to purchase or sell accepted in state.  For the purpose of this section, an offer to purchase or to sell is accepted in this state when acceptance is communicated to the offeror in this state, and has not previously been communicated to the offeror, orally or in writing, outside this state; and acceptance is communicated to the offeror in this state, whether or not either party is then present in this state, when the offeree directs it to the offeror in this state reasonably believing the offeror to be in this state and it is received by the offeror in this state.
>
> Subd. 4.  Offer to sell or purchase not made in state.  An offer to sell or to purchase is not made in this state when the publisher circulates or there is circulated in the publisher's behalf in this state any bona fide newspaper or other publication of general, regular and paid circulation which is not published in this state, or when a radio or television program originating outside this state is received in this state.

Minn. Stat. § 80C.19.

The MFA "was adopted in 1973 as remedial legislation designed to protect potential franchisees within Minnesota from unfair contracts and other prevalent and previously unregulated abuses in a growing national franchise industry."  *Clapp v. Peterson*, 327 N.W.2d 585, 586 (Minn. 1982) (citation omitted); *see also Martin Investors, Inc. v. Vander Bie*, 269 N.W.2d 868, 872 (Minn. 1978).  When the MFA was introduced as a bill in 1973, it was described as a "bill to give the commissioner of securities some control over the franchising business in the state of Minnesota."  *In re Ne. Exp. Reg'l Airlines, Inc.*, 228 B.R. 53, 59 (Bankr. D. Me. 1998) (quoting Hearing on the Minnesota Franchise Act Before the Minnesota Senate, 68th Legis., Reg. Sess. (Minn. 1973) (statement by unidentified senator)).  *Clapp*, relied upon by Defendants, dealt with a technical violation of the MFA requiring a person offering or selling a franchise within the state to register with the Commissioner of Securities a proposed public offering statement making full disclosure of all facts required by statute or rules of the

commissioner. 327 N.W.2d at 586 (citing Minn. Stat. §§ 80C.02 (1980), 80C.04 (1980) and 80C.06 (1980)). It rendered no analysis in its decision as to whether the defendant was offering or selling a franchise within the state. *Martin Investors*, *supra*, only involved a Minnesota-based franchisee where the defendant published advertisements for consultants in at least two newspapers published within Minnesota; the agent of the defendant discussed the proposed consultant arrangement in a long-distance telephone call with an agent of the plaintiff, who was within Minnesota, and the defendant CCC then mailed a sample copy of its standard consultant agreement to him in Minnesota. *See Martin Investors*, 269 N.W.2d at 873. Based on these facts, the court concluded:

> Through these activities, CCC directly induced a Minnesota resident to enter a contractual relationship upon essentially all of the terms proposed in the sample consultant agreement forwarded to Faye but without the benefit of the full disclosure provided by the registration requirements of the Franchises Act. This is precisely the kind of activity that our act was designed to regulate and that must be subjected to the requirements of registration and full disclosure if the protective purposes of the act are to be realized.

*Id.* The Minnesota Supreme Court went on to reject the notion that an offer made in Minnesota needed to be shown in the "strictest sense of contract law" as requiring too narrow a reading of the MFA as a remedial statute. *Id.* at 873-74. Recently the Minnesota Court of Appeals noted that while the *Martin Investors* court "recognized the legislature's intent in adopting the MFA was to protect franchisees in Minnesota" it did "not address . . . the scope of the MFA."[6] *Cambria Co. LLC v. M&M Creative Laminants Inc.*, No. A18-1978, 2019 WL 3543602, at *2 (Minn. Ct. App. Aug. 5, 2019).

---

[6]    In *Cambria*, the Court considered, but ultimately declined, a request to certify the following question: "May a non-Minnesota resident claiming to be a franchisee invoke

One court in this district has characterized territorial applicability of the MFA as "murky."  *Wave Form Sys., Inc. v. AMS Sales Corp.*, 73 F. Supp. 3d 1052, 1062 (D. Minn. 2014).  Indeed, courts examining the issue have reached inconsistent results.  For example, in *Healy v. Carlson Travel Network Associates, Inc.*, 227 F. Supp. 2d 1080 (D. Minn. 2002), the court rejected an argument similar to the one being presented by Plaintiffs:

> Healy urges that the statute applies because the offer to sell the franchise came from an agent of Carlson, a Minnesota corporation.  No authority is cited for the proposition that the MFA applies merely because the franchisor is a Minnesota corporation.  Healy concedes that Crider, the Carlson agent he contacted for information and with whom he negotiated the sale, was based in Florida.  The newspaper advertisement for Carlson franchise opportunities that Healy responded to, was placed in the Chicago Tribune by Crider's office in St. Petersburg, Florida.  The Agreement was presented to and signed by Healy in Illinois.  Healy has not demonstrated that the MFA applies to his case.

*Id.* at 1088; *see also Klosek v. Am. Express Co.*, No. CIV. 08-426 JNE/JJG, 2008 WL 4057534, at *21 (D. Minn. Aug. 26, 2008), *aff'd*, 370 F. App'x 761 (8th Cir. 2010) ("As the statute indicates, the geographic limits do not apply to the entire MFA, but only to 'the provisions concerning sales and offers to sell.'") (quoting Minn. Stat. § 80C.19, subd. 1) (cleaned up).[7]

_____

the provisions of the Minnesota Franchise Act where its only connection with Minnesota is the location of the purported franchisor?"  2019 WL 3543602, at *2.

[7]    The Court in *Klosek*, distinguished the facts in that case from those in *Healey* as follows:

> And though Ameriprise urges otherwise, it appears that *Healy* chiefly involved misrepresentations in the sale of a franchise, and not other complaints under the MFA.  *See id.* at 1083-84.  Because the current litigation does not involve a sale or offer to sell, it is distinguishable from *Healy*.

At least one court has held that "even where a party to a 'franchise agreement' is a Minnesota corporation, the agreement is not within the purview of the MFA if the franchisee is not located in and does not operate in Minnesota." *Johnson Bros. Liquor Co. v. Bacardi U.S.A., Inc.*, 830 F. Supp. 2d 697, 703 (D. Minn. 2011) (citing *Hockey Enters., Inc. v. Total Hockey Worldwide, LLC*, 762 F. Supp. 2d 1138, 1146 (D. Minn. 2011)). The basis of the court's holding was that the "MFA applies only to 'franchise agreements' within the purview of Minnesota law. Minnesota cannot regulate 'franchise agreements' that are formed and preformed in other states." *Id.* (citing *In re St. Paul & K.C. Grain Co.*, 89 Minn. 98, 94 N.W. 218, 225 (Minn. 1903) (noting that "general rule" is that state statutes apply only to the territory of state that enacted the statute)).

In *Candleman Corp. v. Farrow*, No. 9802463, Bus. Franchise Guide (CCH) § 11,635, 1999 WL 35768614 (D. Minn. Feb. 1, 1999), the court found that the MFA applied to the facts in that case because (1) the franchisor's offer to sell the franchise originated from the franchisor's Minnesota office; (2) the acceptance of the offer was received by the franchisor in Minnesota; and (3) the franchise agreement's choice of law provision provided for Minnesota law. *Id.*

In *Wave Form*, *supra*, the plaintiff, an Oregon company, asserted that the MFA applied to its agreement with a Minnesota manufacturer, because the manufacturer's offer to sell originated from Minnesota and acceptance of that offer was received by AMS in Minnesota. 73 F. Supp. 3d at 1059. The plaintiff argued that the "originated from" language was met when the manufacturer transmitted the agreement from its office in

---

2008 WL 4057534, at *21.

Minnesota to Wave Form in Oregon, and the "received by the offeree in this state" language was satisfied when Wave Form executed and subsequently returned the agreement to AMS in Minnesota for its signature. *Id.* at 1060. In an order on a motion for a preliminary injunction, the court found that "Wave Form's position, while it is seemingly a fair construction of the statutory language, fails to account for the MFA's territorial application that was intended by the legislature," and reaffirmed that the "legislative intent behind the passage of the [Franchise Act] was to protect Minnesota franchisees located within Minnesota." *Id.* (citing *Martin Investors*, 269 N.W.2d at 872). Ultimately, the Court held as follows with respect to whether the plaintiff was likely to prevail on its MFA claim:

> At present, whether Wave Form will likely succeed on the merits of its claim is uncertain. The entirety of Wave Form's position rests on the applicability of the MFA. While a construction of the language of the statute does support Wave Form's position, the Minnesota nexus with the factual predicate is very minimal. Other than receiving an offer transmitted from Minnesota and then remitting acceptance back to Minnesota, Wave Form has had no contact with Minnesota. Wave Form has never had a single sale in this state nor does it have any physical presence here. While Wave Form does conduct business in states outside of Oregon, it is undisputed that Minnesota is not one of them. To construe the MFA broadly enough to apply here given the facts currently of record in this case is a stretch.

*Wave Form*, 73 F. Supp. 3d at 1061.

This Court's decision must be informed foremost by the plain language of the MFA. *See Am. Tower, L.P. v. City of Grant*, 636 N.W.2d 309, 312 (Minn. 2001). Here, the pertinent portion of § 80C.19, dealing with offers made in this state provides:

> Offer to sell or purchase made in state. For the purpose of sections 80C.01 to 80C.22, an offer to sell or to purchase is made in this state, whether or not either party is then present in this state, **when the offer originates from this**

> **state** or is directed by the offeror to this state and received by the offeree in this state.

Minn. Stat. § 80C.19, subd. 2 (emphasis added). There is nothing in the language of the statute suggesting that the MFA cannot apply to a foreign franchisee when the offer, in this case a solicitation, "originates" from Minnesota. The Court in *Wave Form* conceded that this was "seemingly a fair construction of the statutory language," 73 F. Supp. 3d at 1060, before ignoring that same language and concluding that the legislative intent behind the passage of the MFA was to protect Minnesota franchisees located within Minnesota. There is nothing in the MFA remotely carving out such an exception. Indeed, in 1981, the legislature added an exemption to the MFA's registration requirements under Minn. Stat. § 80C.02, exempting any "offer or sale of a franchise to a resident of a foreign state, territory, or country who is neither domiciled in this state nor actually present in this state, if the franchise business is not to be operated wholly or partly in this state, and if the sale of this franchise is not in violation of any law of the foreign state, territory, or county concerned." Minn. Stat. § 80C.03(h) (1981 Supp.). Had the legislature desired a similar carve-out regarding the prohibitions set forth in Minn. Stat. § 80C.13 for franchises located outside of the state of Minnesota it could have included a similar exemption within Section 80C.03. If the statutory language were construed as urged by Defendants, Minnesota would be without authority to enforce its franchise laws against a business located physically within Minnesota, but which directed its fraudulent efforts towards non-residents **from** within Minnesota. It is unlikely that the legislature intended such a result. Instead, the focus, based on the plain language of the statute is on the nexus of the conduct—whether the solicitations at issue originated from

Minnesota. *See Candleman*, Bus. Franchise Guide (CCH) § 11,635, 1999 WL 35768614. Such an interpretation is most consistent with the language of the MFA and the general rule that Minnesota statutes are to apply to conduct within its borders.

However, the Court cannot interpret the MFA so broadly that it will apply to a Minnesota company, such as FCI, even through a theory of respondeat superior or agency as argued by Plaintiffs (Dkt. 15 at 20-23), if none of the illegal acts complained of originated from Minnesota. *See Healy*, 227 F. Supp. 2d at 1088. The Court will not rewrite the MFA to encompass such acts, regardless of its remedial nature.

The only allegations in the Amended Complaint regarding Golliver are that she is an agent of FCI and that she resided and is a citizen of Illinois. (Dkt. 6 ¶ 7.) There are no plausible factual allegations in the Amended Complaint suggesting that the operative solicitations at issue originated from Minnesota, including that Golliver made the representations while in Minnesota. Under the doctrine of respondeat superior, "'the act of an agent within the scope of his agency is the act of his principal. The principal is liable because the law attributes to him the act of his agent, with the result that both are liable jointly and severally to the person injured by the wrongful act.'" *D.W. v. Radisson Plaza Hotel Rochester*, 958 F. Supp. 1368, 1380 (D. Minn. 1997) (quoting *Melady v. South St. Paul Live Stock Exch.*, 142 Minn. 194, 171 N.W. 806, 807 (1919)) (cleaned up). Even assuming that these doctrines apply to the MFA, they only impute the acts of Golliver back to FCI in Minnesota for purposes of liability and do not speak to what matters for the purposes of the MFA—whether the malfeasance at issue originated from Minnesota. It would be a closer question if the Amended Complaint alleged that

someone from within FCI in Minnesota directed Golliver to make the specific alleged solicitations to Plaintiffs. However, that is not the case here.[8]

For all of these reasons, the Court finds that Plaintiffs' MFA claim should be dismissed.

## C.     Plaintiffs' Claim under the South Carolina Unfair Trade Practices Act

Defendants assert that Plaintiffs' claim under SCUTPA should be dismissed because Plaintiffs have not identified in their Amended Complaint any South Carolina residents that have been harmed or could be harmed by Defendants' conduct. (Dkt. 11 at 17.) In addition, Defendants argue that Plaintiffs' allegations fail to specifically identify any person, let alone "the people" in South Carolina, that have been or are at risk of being harmed by Defendants' alleged conduct. (*Id.* at 18.) According to Defendants, Plaintiffs' summary allegation that Defendants have an "established practice of selling franchises" and present "a substantial risk of further and continuing injury to the public at large" is insufficient to establish a risk to the public as is required to state a claim under SCUTPA. (*Id.*)

Under SCUTPA, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any **trade or commerce** are hereby declared unlawful." S.C.

---

[8]     Plaintiffs asked that, if the Court finds the Complaint does not state a claim under the MFA, the Court give Plaintiffs leave to amend on the basis of an Independent Consultant Agreement between FCI and its consultants regarding certain generalized procedures and requirements. (Dkt. 15 at 7.) However, even if there is such an agreement, it does not mean that the representations originated in Minnesota, as it does not change the fact that it is not alleged that Golliver herself made the operative allegedly fraudulent solicitations at issue from within Minnesota.

Code § 39-5-20 (emphasis added).  The terms "trade" and "commerce" under SCUTPA

are defined as follows:

> "Trade" and "commerce" shall include the advertising, offering for sale, sale
> or distribution of any services and any property, tangible or intangible, real,
> personal or mixed, and any other article, commodity or thing of value
> wherever situate, and **shall include any trade or commerce directly or
> indirectly affecting the people of this State**.

S.C. Code Ann. § 39-5-10(b) (emphasis added).

To assert a viable claim under SCUTPA, Plaintiffs must adequately allege three

elements: "'(1) the defendant engaged in an unlawful trade practice; (2) the plaintiff

suffered actual, ascertainable damages as a result of the defendant's use of the unlawful

trade practice; and (3) the unlawful trade practice engaged in by the defendant had an

adverse impact on the public interest.'"  *PTA-FLA, Inc. v. ZTE Corp.*, No. 3:12-CV-

02616-CMC, 2015 WL 13593694, at *15 (D.S.C. July 27, 2015), *aff'd*, 715 F. App'x 237

(4th Cir. 2017) (quoting *Bessinger v. Food Lion, Inc.*, 305 F. Supp. 2d 574, 579 (D.S.C.

2003), *aff'd sub nom Bessinger v Food Lion, LLC*, 115 F. App'x 636 (4th Cir. 2004)).

As set forth above, a "plaintiff bringing a private cause of action under SCUTPA

must allege and prove that the defendant's actions adversely affected the public interest."

*Morgan v. HSBC Bank USA, Nat. Ass'n*, No. 6:13-CV-03593-JMC, 2015 WL 3888412,

at *4 (D.S.C. June 24, 2015) (citation omitted).  "Conduct that affects only the parties to

the transaction provides no basis for a SCUTPA claim."  *Id.* (citing *Robertson v. First

Union Nat'l Bank*, 350 S.C. 339, 565 S.E.2d 309, 315 (S.C. Ct. App. 2002)).

"An impact on the public interest may be shown if the acts or practices have the

potential for repetition."  *Skywaves I Corp. v. Branch Banking & Tr. Co.*, No. 2015-

001809, --- S.E.2d ----, 2018 WL 2031845, at *9 (S.C. Ct. App. May 2, 2018) (quoting

*Singleton v. Stokes Motors, Inc.*, 358 S.C. 369, 379, 595 S.E.2d 461, 466 (2004)).  The

potential for repetition may be shown in either of two ways:

> (1) by showing the same kind of actions occurred in the past, thus making it
> likely they will continue to occur absent deterrence; or (2) by showing the
> company's procedures created a potential for repetition of the unfair and
> deceptive acts.

*Id.* (quoting same); *see also Wright v. Craft*, 372 S.C. 1, 640 S.E.2d 486, 502 (S.C. Ct.

App. 2006) (citations omitted).  "Allegations in a SCUTPA claim of ongoing actions by a

defendant are not sufficient to survive a motion to dismiss absent **allegations of specific**

**facts** that the conduct has an adverse impact on public interest."  *Flowers v. Anderson*,

No. 2:17-CV-2739-BHH-MGB, 2018 WL 3254485, at *6 (D.S.C. May 11, 2018)

(emphasis added), *R&R adopted*, 2018 WL 3980210 (D.S.C. Aug. 21, 2018) (citing

*Mach. Sols., Inc. v. Doosan Corp.*, No. 3:15-cv-03447-JMC, 2016 WL 2756429, at *4

(D.S.C. May 12, 2016) (citing *Companion Prop. & Cas. Ins. Co. v. U.S. Bank Nat'l*

*Ass'n*, No. 3:15-cv-01300-JMC, 2015 WL 7568613, at *9 (D.S.C. Nov. 24, 2015))).

As alleged in the Amended Complaint, Plaintiffs Salvatore Macaluso and Jennifer

Macaluso are citizens of North Carolina and reside in that state.  (Dkt. 6 ¶ 4.)  Plaintiff

Rise Above Fitness, Inc. is a North Carolina corporation with its principal place of

business in North Carolina.  (*Id.* ¶ 5.)  FCI is a corporation formed under the laws of

Minnesota, with its principal place of business in Eden Prairie, Minnesota, and Golliver is

Citizen of Colorado and resides in that state.  (*Id.* ¶¶ 6-7.)  In sum, there no allegations in

the Amended Complaint that any of alleged misrepresentations or other conduct by

defendants occurred in South Carolina or were aimed to anyone in South Carolina, or for

that matter had anything to do with South Carolina. The only connection alleged is that in reliance of Plaintiffs' representation, "Plaintiffs signed a multi-unit franchise agreement on November 4, 2016, paid ILKB $145,000 in franchise fees for the purchase of five territories; signed five franchise agreements on November 4, 2016, and spent over $500,000 building out and outfitting a location in Matthews, North Carolina and a second location in Fort Mill, South Carolina." (*Id.* ¶ 18.) It is not alleged that the opening of this ILKB fitness facility injured the citizens of South Carolina nor are there any assertions that the South Carolina location has closed, even assuming that the closing of a fitness club would qualify as a sufficient adverse impact. Any loss in profit as alleged, is an injury faced by non-citizens of South Carolina. (*Id.*)

Plaintiffs point to *Cheshire v. Coca-Cola Bottling Affiliated, Inc.*, 758 F. Supp. 1098 (D.S.C. 1990), for the proposition that SCUTPA is not limited to in-state conduct by its own terms. (Dkt. 15 at 15.) In *Cheshire*, the court found that "South Carolina's UTPA is not limited to in-state conduct by its own terms nor does it contain on its face any undue burdens on interstate commerce. The court believes that its purpose and intent is to hold parties causing **injury in South Carolina** accountable in the courts of this state, insofar as possible." 758 F. Supp. at 1098 (emphasis added). Plaintiffs argue that they have properly alleged that they sustained injury and damages of no less than $400,000 in South Carolina directly from Defendants' violations of SCUTPA. (Dkt. 15 at 15.) However, the Court finds that Plaintiffs and the *Cheshire* overextend the reach of SCUTPA given that the statute by its own plain terms governs "any trade or commerce directly or indirectly **affecting the people of this State**." S.C. Code § 39-5-10(b)

(emphasis added).  "[T]he obvious purpose of the language 'shall include any trade or commerce directly or indirectly affecting the people of this State,' then, is to circumscribe the kind of trade or commerce in the conduct of which an unfair or deceptive act or practice can serve as a basis for a UTPA action."  *Noack Enters., Inc. v. Country Corner Interiors of Hilton Head Island, Inc.*, 290 S.C. 475, 478-79, 351 S.E.2d 347, 349 (S.C. Ct. App. 1986).  "In focusing on the defendant's past actions, South Carolina courts have looked at the harm to the people of South Carolina caused by the challenged practice."  *Network Computing Servs. Corp. v. Cisco Sys., Inc.*, 152 F. App'x 317, 321 (4th Cir. 2005); *see also R.J. Clarkson Co. Inc. v. Jenn-Air Co.*, 85 F.3d 616 (4th Cir. 1996) ("Here, Clarkson Co. has alleged no harm to the citizenry of South Carolina at large.  Its claim relates only to its private business relationship with Jenn-Air.  Clarkson Co. claims to be wearing the mantle of other distributors harmed by the termination of the two-step system, but there is no evidence that any of those distributors are South Carolina citizens.").

Here, there is no harm that is plausibly alleged as it relates to the citizens of South Carolina by what amounts to a private dispute between Defendants and Plaintiffs regarding alleged deceptive trade practices occurring outside of South Carolina.  *See Noack Enters.*, 351 S.E.2d at 349 (quoting Note, Consumer Protection and the Proposed "South Carolina Unfair Trade Practices Act," 22 S.C. L. Rev. 767, 787 (1970)) ("The legislature intended in enacting the UTPA "to control and eliminate 'the large scale use of **unfair and deceptive trade practices within the State of South Carolina**.'"") (emphasis added).  Although every private dispute doubtlessly has remote public

ramifications, the opening of a fitness club in this case within South Carolina "cannot be held to satisfy the element of injury to the public interest which is a prerequisite to any recovery under SCUTPA.  Were the rule otherwise, every ordinary commercial dispute would become a candidate for the extraordinary remedies provided by the Act."  *Omni Outdoor Advertising, Inc. v. Columbia Outdoor Advertising, Inc.*, 974 F.2d 502, 508 (4th Cir. 1992).

Plaintiffs argue that it "is not a 'very long stretch' to apply SCUTPA in this situation" and that "Plaintiffs properly alleged that Defendants' pattern and practice poses an ongoing risk to the public in South Carolina and nationwide. . . ."  (Dkt. 15 at 17.)  To this end, Plaintiffs allege as follows in the Amended Complaint:

> FCI and Golliver have engaged in a continuous and repeated pattern of selling franchises based upon false representations, omissions and violations of the FTC Rule.  This pattern of fraud and unlawful conduct has injured not only over a dozen franchisees of ILKB, but also franchisees of other systems, notably of the hearing aid franchisor known as Zounds.  FCI and Golliver knew that their misrepresentations were false and misleading and would likely create substantial injury to the public.  FCI's and Golliver 's established practice of selling franchises unlawfully and fraudulently presents a substantial risk of further and continuing injury to the public at large.

(Dkt. 6 ¶ 45.)  However, absent from these allegations are specific facts that the conduct has an adverse impact on public interest in South Carolina.  There are no allegations that anyone within South Carolina was subjected to misrepresentations by Defendants leading to the purchase of a franchise or that FCI is presently pushing ILKB or Zounds franchises on unwary consumers, including those within South Carolina.  Indeed, Plaintiffs' reference to Zounds is conclusory with no specific facts alleged regarding the conduct at issue.  While Plaintiffs point to the twelve lawsuits, presumably within this District,

related to ILKB franchises (Dkt. 15 at 15), none of them pertain to unfair and deceptive trade practices within South Carolina.  Moreover, the mere fact that Defendants are still in the franchise broker business does not set forth specific facts that the Defendants' procedures create a potential for repetition of the unfair and deceptive acts within South Carolina.  *See Mach. Sols., Inc. v. Doosan Corp.*, No. 3:15-CV-03447-JMC, 2016 WL 2756429, at *3-4 (D.S.C. May 12, 2016).

For all of these reasons, Plaintiffs' SCUTPA claim should be dismissed.

## IV.    <u>RECOMMENDATION</u>

Based on the above, and on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) (Dkt. 9) be **GRANTED** in part and **DENIED** in part as follows:

1.    Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) (Dkt. 9) be **GRANTED** as to Plaintiffs' claims under the Minnesota Franchise Act and South Carolina Unfair Trade Practices Act, and that the claims be **DISMISSED WITHOUT PREJUDICE**; and

2.    Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) (Dkt. 9) be **DENIED** as to Plaintiffs' claim under the New York Franchise Sales Act.


DATED: December 19, 2019                    <u>*s/ Elizabeth Cowan Wright*</u>
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge

## **NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).